**FILED**

May 01 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**　　　　　　　　　　　　　　　　**CASE NUMBER:** CR24-00243 JD

USA v. Daniel Schatt & Joseph Podulka　　　　　CR

| | | | |
|---|---|---|---|
| **Is This Case Under Seal?** | Yes ✔ | No | |
| **Total Number of Defendants:** | 1 | 2-7 ✔ | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ | |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔ | OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✔ | |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ | |
| **Is this a RICO Act gang case?** | Yes | No ✔ | |

**Assigned AUSA (Lead Attorney):** Barbara J. Valliere

**Date Submitted:** 4/30/2024

**Comments:**

RESET FORM　　　SAVE PDF

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

### VENUE: SAN FRANCISCO

CR24-00243 JD

UNITED STATES OF AMERICA,

V.

DANIEL SCHATT & JOSEPH PODULKA

**FILED**

May 01 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

DEFENDANT(S).

# INDICTMENT

18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1956(a)(1)(A) – Engaging in a Financial Transaction to Promote Unlawful Activity;
18 U.S.C. § 1957 – Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) – Forfeiture Allegation

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 30th day of

April, 2024.

S. Ybarra

Clerk

Bail, $ Arrest Warrant

Hon. Lisa Cisneros, U.S. Magistrate Judge

1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
3
4
5
6
7

FILED

May 01 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,            )   CASE NO.    CR24-00243 JD
                                         )
12          Plaintiff,                   )   VIOLATIONS:
                                         )   18 U.S.C. § 1349 – Conspiracy to Commit Wire
13      v.                               )   Fraud;
                                         )   18 U.S.C. § 1343 – Wire Fraud;
14  DANIEL SCHATT, and                   )   18 U.S.C. § 1956(a)(1)(A) – Engaging in a Financial
    JOSEPH PODULKA,                      )   Transaction to Promote Unlawful Activity;
15                                       )   18 U.S.C. § 1957 – Engaging in Monetary
            Defendants.                  )   Transactions in Property Derived from Specified
16                                       )   Unlawful Activity;
                                         )   18 U.S.C. § 2 – Aiding and Abetting;
17                                       )   18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) –
                                         )   Forfeiture Allegation
18                                       )
                                         )   SAN FRANCISCO VENUE
19  ──────────────────────────────

20                         I N D I C T M E N T

21  The Grand Jury charges:

22                      INTRODUCTORY ALLEGATIONS

23          At all times relevant to this Indictment:

24                            **Relevant Entities**

25          1.      Cred LLC or Cred Inc. (Cred) was founded in 2018 by DANIEL SCHATT and

26  Individual #1 to serve as a global financial services platform serving retail and institutional clients.  Cred

27  was headquartered in San Francisco, California, with offices in San Francisco, California, San Mateo,

28  California, and Los Angeles, California.

INDICTMENT

2.      moKredit Inc. was a lending platform owned by Individual #1, incorporated in the Cayman Islands and based in Shanghai, China.  moKredit Inc., also known as Mo9, provided microcredit loans to Chinese borrowers.

3.      "Company #1" was a cryptocurrency exchange that primarily marketed to retail customers headquartered in New York, New York.

4.      "Company #2" was a global financial services firm that specialized in digital assets headquartered in Singapore.

5.      "Company #3" was a global company with an American headquarters in Kansas City, Missouri, that provided insurance, risk management, and employee benefits.

**Relevant Individuals**

6.      Defendant DANIEL SCHATT was co-owner and Chief Executive Officer (CEO) of Cred.  SCHATT resided in San Mateo, California.

7.      Defendant JOSEPH PODULKA was the Chief Financial Officer (CFO) of Cred. PODULKA resided in Palo Alto, California.

8.      Co-conspirator James Alexander was the Chief Capitol Officer (CCO) for Cred.

9.      "Individual #1" was the co-owner of Cred and owner of moKredit Inc.

10.     "Victim #1" was a Cred customer who resided in Seattle, Washington.

11.     "Victim #2" was a Cred customer who resided in San Juan, Puerto Rico.

12.     "Victim #3" was a Cred customer who resided in San Juan, Puerto Rico.

13.     "Victim #4" was a Cred customer who resided in St. Paul, Minnesota.

14.     "Victim #5" was a Cred customer/investor headquartered in San Francisco, California.

15.     "Victim #6" was a Cred customer who resided in Phoenix, Arizona.

16.     "Victim #7" was a Cred customer who resided the United Kingdom.

17.     "Victim #8" was a Cred customer who resided in Antioch, California.

18.     "Victim #9" was a Cred customer who resided outside of the United States.

19.     "Cred Customer #1" resided in San Juan, Puerto Rico.

20.     "Cred Customer #2" resided in Pittsburgh, Pennsylvania.

21.     "Cred Employee #1" resided in Los Angeles, California and Denver, Colorado.

**Relevant Terms**

22.    "Fiat currency" was a term used to refer to government-issued currency, such as the U.S. dollar, that is not backed by a physical commodity, but rather the government that issued it.

23.    "Cryptocurrency" was a digital currency in which transactions were verified and records maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government.  Like traditional fiat currency, there were multiple types of cryptocurrencies, such as Bitcoin ("BTC"), Ethereum ("ETH"), and Ripple (XRP).

24.    Cryptocurrency owners typically stored their cryptocurrency in digital "wallets," which were identified by unique electronic "addresses."

25.    "Hedging" is a risk management strategy employed to offset losses in investments by taking an opposite position in a related asset.

**Scheme to Defraud**

26.    From a time unknown but no later than March of 2020 and continuing through in or about November of 2020, defendants DANIEL SCHATT, JOSEPH PODULKA, James Alexander and others known and unknown to the grand jury engaged in a scheme, plan, and artifice to defraud, among others, Cred's customers and investors  as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promise, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

27.    The objectives of the scheme to defraud were, among other objectives, to cause Cred customers and investors to provide their fiat and digital currencies to Cred for its use by falsely representing (a) that Cred "only" engaged in "collateralized or guaranteed lending" when the bulk of its loans were secured by no more than a promise to repay; (b) that all of Cred's crypto positions were "hedged" and that it implemented and maintained an "all weather approach" to investment to protect against market volatility, where Cred had no hedging strategy in place after March 16, 2020; (c) that following the "flash crash" that occurred on March 12, 2020 when, due to concerns about Covid-19, Bitcoin and cryptocurrency prices plummeted, Cred was solvent and had generated "a positive net income between April 30, 2020 and September 1, 2020," despite internal liquidity analyses which revealed an overall deficit in the company that grew to in excess of $40 million by October 1, 2020; and

(d) that Cred provided "comprehensive insurance" that assured that "[i]f the worst happens and Cred loses customer funds," customers would have "certainty that they will be made whole," despite knowing that the insurance policies provided little to no relief for any loss of customer funds.

28.    The manner and means by which defendants and their co-conspirators sought to accomplish the objectives of the scheme to defraud included, but were not limited to, the following:

a.    Defendants and others solicited individuals to lend cryptocurrency and fiat currency to Cred in exchange for interest or loans in dollars against cryptocurrency assets.

b.    Defendants and others created and approved, and caused to be created and approved, promotional and other materials that contained material misrepresentations, including representations about the uses of the customers' assets, the financial health and strength of Cred, the existence of Cred's hedging strategies and other risk management strategies, and the extent to which insurance was available to make Cred customers "whole."

c.    Defendants emailed and caused others to email promotional and other materials to Cred customers, with each wire being a separate execution of the scheme to defraud.

d.    These promotional and other materials also omitted materials facts, including that from March 12, 2020 onward, Cred was consistently having liquidity problems, that moKredit had failed to repay the principal of its loans and owed Cred approximately $40 million, and that defendants and others used new customer money to pay prior customers' redemptions and to pay operating expenses rather than lend it to third parties to earn interest.

e.    Based on defendants' and others' false and misleading representations and omissions, including material misrepresentations and omissions of material facts individuals lent or invested more than $150 million with Cred before November 7, 2020.

As part of the conspiracy and the scheme to defraud the defendants and their co-schemers also engaged in the following acts:

***Overview***

29.    From 2018 through 2020, Cred LLC (Cred), a company found by SCHATT and Individual #1 and located in the Northern District of California, provided financial services to holders of cryptocurrency ("crypto") and other assets.  On November 7, 2020, Cred collapsed and filed for

bankruptcy, causing losses to its customers of crypto assets with a market value of $150 million at the time of the bankruptcy, and a maximum market value of over $783 million since the date of the bankruptcy.

30.     From its inception in 2018, Cred concealed and misrepresented critical features of its business model to lure and maintain clients who had significant crypto assets. Cred attracted customers to its products by promising that they would earn a significant yield on their crypto assets, something that was difficult to obtain in 2018. What was unknown to customers was that Cred largely relied on one entity – a Chinese company called "moKredit" founded by Cred's founder/half-owner Individual #1 - to generate virtually all of the interest payments that provided that yield. What was also largely unknown to Cred customers was that moKredit generated the money Cred used to pay interest to its customers by making unsecured micro-loans to Chinese gamers.

31.     Despite a lopsided and largely undisclosed reliance on moKredit, throughout 2019 Cred grew and gained customers. It hired employees, it partnered with other crypto-related businesses, it finalized and launched a product called the CredEarn program, and it generally timely paid the promised interest on its customers' loaned crypto. In its marketing materials and to its employees, Cred brass painted a rosy picture of the future heading into 2020.

32.     Cred's rosy-looking future evaporated nearly overnight in March of 2020. On March 11, 2020, the price of Bitcoin dropped by about 40 percent. Within days of this so-called "flash crash," Cred learned from its hedging partner that it was underwater and needed to liquidate all its trading positions. The hedging partner then abruptly ceased to do business with Cred and threatened to sue, leaving Cred with no hedges and no hedging strategy going forward. Cred learned soon thereafter that moKredit -- to whom by then it had lent approximately $40 million dollars -- would be unable to repay the principal as it had promised. Subsequently prepared internal liquidity analyses revealed Cred to be in dire straits. In essence, immediately following the "flash crash" and for the seven months before it abruptly declared bankruptcy in November, Cred was effectively insolvent.

33.     Despite this reality, CEO SCHATT, CFO PODULKA, and until late June 2020, CCO James Alexander, tried to keep the company afloat by bringing in new customer funds and keeping requests for redemptions from existing customers at bay. But instead of revealing to its customers (or

1  even to most of its own employees) Cred's drastically changed landscape, SCHATT, PODULKA, and

2  Alexander continued to paint the same rosy picture of the company's health that it did pre-flash crash.

3  In so doing, they made or authorized the making of false and misleading statements to prospective and

4  existing customers about, among other things, Cred's financial security, its (now nonexistent) hedging

5  strategy, and its ability to recover any loss of customers funds through insurance.

6                              *The Creation of Cred*

7          34.    In January of 2018, SCHATT and Individual #1, both prior employees of PayPal,

8  established an entity named Cyber Quantum in Singapore with the eye toward an Initial Coin Offering in

9  May of 2018.  In the spring of 2018, SCHATT and Individual #1 also established Libra Credit (later

10 known as Cyber Quantum) in Singapore.

11         35.    In April of 2018, SCHATT joined the Board of Directors for Company #1.

12         36.    In May of 2018, Cyber Quantum offered a stablecoin called the Libra Token, the

13 proceeds of which were later used to establish Cred Inc. in the United States.  SCHATT and Individual

14 #1 each owned 50 percent of Cred.

15         37.    During the summer of 2018, SCHATT asked James Alexander to provide consulting

16 services to Cred LLC.

17         38.    On August 27, 2018, Libra Credit officially changed its name to Cred LLC and

18 incorporated in Delaware, with its principal place of business in San Francisco, California.  Also on

19 August 27, 2018, SCHATT hired Coconspirator Alexander as the CCO for Cred.

20         39.    During the fall of 2018, Cred developed two products: (a) CredBorrow, which would

21 offer loans in United States dollars to customers using the customers' cryptocurrency as collateral; and

22 (b) in conjunction with Company #1, CredEarn, which would allow customers to deposit their

23 cryptocurrency and earn a yield on that currency of up 12 percent to be paid in cryptocurrency.

24 CredEarn advertised itself as a means for customers to earn interest on their cryptocurrency assets by

25 depositing them with Cred, who would convert the cryptocurrency to fiat currency and or stablecoin and

26 lend it to other customers on a "fully collateralized or guaranteed" basis.

27

28

INDICTMENT                            6

40.     On December 27, 2018, Cred and moKredit, through Cred co-owners SCHATT and Individual #1, executed a loan and security agreement for moKredit with a $100 million credit line. From December of 2018 through December of 2019, Cred loaned moKredit approximately $40 million.

41.     On or about January 16, 2019, Cred and Company #1 entered into a formal agreement whereby Company #1 would integrate CredEarn on Company 1's website. On January 24, 2019, Company #1 launched CredEarn on its platform.

42.     As of March 25, 2019, there were 691 CredEarn customers, 645 of whom were pre-existing Company #1 customers. Among other provisions, some of the CredEarn Line of Credit Agreements contained the following language:

**4.4     Financial Information.** All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower.

In other words, the CredEarn agreements required Cred to provide financial information sufficient to "give the Lender accurate knowledge of the Borrower's financial condition." Moreover, the Line of Credit agreements explicitly stated that this warranty applied "[w]hen the Borrower signs the Agreement, and until the Lender is repaid in full," and that "[e]ach request for an extension of credit constitutes a renewal of these representations and warranties as of the date of the request."

### *The Marketing of Cred and CredEarn*

43.     On June 3, 2019, Cred issued a press release announcing the CredEarn product, offering up to 10 percent interest, and claiming that Cred was "a licensed lender with comprehensive insurance." On June 4, 2019, Cred posted on its blog site an article written by SCHATT entitled "Going Above and Beyond: Cred leads with most comprehensive risk management and insurance of any crypto-lending platform." The blog posting, which included the logo of Company #3, discussed Cred's insurance coverage falsely and misleadingly claiming that "[i]f the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole." On October 16, 2019, Cred reposted a slightly edited version of the same article written by SCHATT entitled "Going Above and Beyond: Cred leads with most comprehensive risk management and insurance of any crypto-lending platform,"

1   again falsely and misleadingly claiming that "[i]f the worst happens and Cred loses customer funds,

2   customers deserve certainty that they will be made whole."

3       44.    Throughout 2019 and into 2020, Cred's marketing materials and its sales team's talking

4   points contained three core representations, all of which were then or over time became false or

5   misleading: (1) Cred lends its customers' assets on a "fully collateralized and guaranteed basis," and that

6   "any borrower must collateralize their loan"; (2) all of Cred's "crypto positions are hedged"; and (3)

7   Cred has "comprehensive insurance," such that "[i]f the worst happens and Cred loses customer funds,

8   customers deserve certainty that they will be made whole."

9           ***2020: Cred attempts to diversify, COVID-19 escalates, Bitcoin plummets***

10       45.    As of January of 2020, Cred had lent moKredit 80 percent of its assets, or a total of

11   approximately $40 million.  To mitigate the potential fallout from any default on the moKredit loans,

12   Cred began to look for ways to diversify.

13       46.    To that end, in January of 2020, James Alexander identified Income Opportunities

14   (Luxembourg) S.A. (Income Properties), a Luxembourg company, as an entity that would issue bonds

15   backed by Cred's moKredit loans.  On January 30, 2020, James Alexander arranged to sell $14 million

16   worth of moKredit's debt to Company #2 and Cred Customer #1 through something called "the

17   Luxembourg Bond."

18       47.    Meanwhile, Cred began looking for asset managers in the United States for placement of

19   customer funds.  To that end, on February 2, 2020, a man who identified himself as "Richard Chapman"

20   from an entity named "QuantCoin" reached out to Alexander to inquire about serving as an asset

21   manager for Cred.  On February 3, 2020, Alexander met "Richard Chapman" at a café in Paris to discuss

22   QuantCoin's management of a portion of Cred's bitcoin allocation.  The next day, on February 4, 2020,

23   SCHATT signed an agreement authorizing the transfer of 500 bitcoin (then worth approximately $4.59

24   million) to QuantCoin, and on February 10, 13, and 18, 2020, a Cred employee transferred an additional

25   300 bitcoin (then worth approximately $2.75 million) to "Scott Foster" at Kingdom Trust, an individual

26   who "Chapman" had identified as the administrator for QuantCoin.

27

28

48.     On March 10, 2020, Alexander filed documents with the state of Delaware incorporating a business called Cred Capital.  The stated purpose of Cred Capital was to oversee Cred's assets management strategies.

49.     Meanwhile, the COVID-19 outbreak began to affect the financial markets including the price of Bitcoin.  On March 11, 2020, the Bitcoin and overall cryptocurrency market took a downward turn.  Specifically, on March 11, 2020, the closing price for Bitcoin was $7,932.81, but on March 12, 2020, it dropped 38 percent, closing for the day at $4,858.38 and creating a so-called "flash crash."  On March 13, 2020, the United States President declared that COVID-19 was a national emergency.

50.     The "flash crash" had a devastating and immediate effect on Cred's bottom line.  Because of the drop in the price of Bitcoin, Cred was unable to meet its margin calls, and its hedges got "blown out."  In an effort to cover its losses and re-establish its hedges, on March 12, 2020, Alexander  emailed Individual #1 stating that Cred needed "to recall cash" of "approximately $10 million" of the approximately $40 million moKredit owed "to support our hedge position."  Individual #1 informed SCHATT, PODULKA, and Alexander that moKredit could not then repay the loan principal.

51.     Early on March 12, 2020, Company #2 informed SCHATT, PODULKA, and Alexander that Cred presently had a short position of over $27 million in all crypto and that for "every $100 move" in Bitcoin "you will make or lose around $400.000."

52.     Later on March 12, 2020, while Cred desperately but unsuccessfully tried to recall $10 million from moKredit, SCHATT sent an email to Cred customers entitled "An Important Message from Cred's CEO."  Despite the devasting effect of the "flash crash" on Cred's bottom line, in that message, SCHATT told Cred customers that Cred was "prepared for extreme situations like the coronavirus (COVID-19) outbreak," and that he was "proud of Cred's preparation and ability to operate the business soundly, regardless of the market direction."  Despite that its hedges had been "blown," SCHATT told the customers that "[w]e are convinced now more than ever that Cred's 'All Weather' approach to risk management and deep understanding of capital markets will be of great help to our partners and customers."

53.     On  March 12, 2020, Company #2, then solely responsible for Cred's hedging strategy, sent an email to Alexander confirming that "all of your BTC futures positions were liquidated" and

informing him that Cred then had a short position of $27 million. Company #2 asked Cred for an additional $3 million in collateral.

54.    On March 16, 2020, Cred's General Counsel informed SCHATT, PODULKA, and Alexander that Cred's financial statements showed that as of "this morning" Cred may not be "financial[ly] solvent" and thus "Cred must be careful at all times to be accurate in its statements to its creditors and to all stakeholders" and "not to mislead our customers and creditors."

55.    Despite these warnings, the Cred sales team continued to seek new customer funds using the same talking points and reassurances about risk management that they had used pre-crash. For example, on March 18, 2020, despite that Cred had lost all of its hedges and its solvency was being questioned by its General Counsel, a Cred salesperson at the direction of Alexander and SCHATT, reassured Victim #1 that the flash crash "was a good thing for our company," because "our capital market team was able to protect all of our positions and even captured a significant premium through this event – all assets are safe and we will not have any problem delivering principle (sic) on interest." Based in part on Victim #1's belief in the truthfulness of these statements, on April 14, 2020, Victim #1 renewed his loan of 58.3 bitcoin (then worth more than $400,000) under the CredEarn program.

56.    On April 5, 2020, Cred Employee #1, charged with analyzing Cred's financial situation, circulated to the Cred LLC Investment Committee comprised of SCHATT, PODULKA, and Alexander, a liquidity analysis of the company "Post March 2020 Flash Crash." The analysis revealed that Cred was operating at a loss and was completely exposed to losing money as the price of Bitcoin rose because it no longer had hedges in place. As part of that analysis, Cred Employee #1 added that Cred's recall of approximately $10 million from Cred's lending partner, moKredit, "was delayed," but noted that moKredit had agreed to a loan repayment schedule which included two $4-million payments, one in June and one in July of 2020.

57.    On April 13 through 15, 2020, Victim #2 had an email exchange with a Cred salesperson regarding his potential investment. In response to Victim #2's query about "[h]ow much money" Cred had "right now," the salesperson directed Victim #2 to PODULKA who wrote that while Cred "did lose money in 2019," it "ended up with about $2M in equity" and "expected to be profitable by Q4 of this year." The salesperson added that "[t]he company has plenty of working capital as well as access to

$5M in debt." Relying on the truthfulness of these statements, on April 23, 2020, Victim #2 lent Cred 20 bitcoin, then worth more than $150,000, and 1720 ETH, then worth approximately $339,390.

58.    Meanwhile, on May 14 and 15, 2020, Cred General Counsel reraised specific concerns to the marketing team about claims Cred was making to its customers about the scope of its insurance given that claims Cred had submitted to its insurance companies had been denied. Questioning the claim that "Cred has one of the most comprehensive insurance policies available to the market," the General Counsel cautioned that that language "could mislead someone into thinking that their crypto is insured when it is not" and that "no such insurance exists." Despite the General Counsel's warning, SCHATT told the marketing team to continue to use the term "comprehensive insurance" in its materials.

59.    In May of 2020, moKredit informed Cred that it would be unable to pay the interest it had promised or the principal on its loans. At that point, Cred's General Counsel told SCHATT to send the liquidity analysis to Individual #1 to let him know that Cred was in a "solvency crisis."

60.    Meanwhile in May of 2020, SCHATT and Alexander met with Company #1 to explain the purpose of the newly incorporated Cred Capital. When representative for Company #1 asked SCHATT and Alexander why they were making this change instead of continuing to rely on moKredit for its interest payment, Company #1 was told that Individual #1 had "done enough" for Cred, and that Cred could now operate on its own. Neither SCHATT nor Alexander told Company #1 about the "solvency crisis," or that moKredit had failed and was failing to repay the principal on its loans.

### Summer 2020: James Alexander is fired; customer funds are used to pay redemptions; and QuantCoin is revealed to be a scam

61.    In June 2020, SCHATT and PODULKA challenged Alexander about the formation and structure of Cred Capital. In the midst of that dispute, on or about June 24, 2020, SCHATT fired Alexander. Thereafter, the Cred sales team reported directly to SCHATT and PODULKA.

62.    In June, with the liquidity crisis worsening, SCHATT and PODULKA continued to paint a rosy picture of Cred's financial stability both inside and outside of the company. Inside the company, SCHATT and PODULKA continued to hold monthly all-hands meetings claiming that the company was in good financial condition. To its customers, Cred continued to market its products in the same

manner, claiming that (a) Cred engaged in "collateralized or guaranteed lending"; (b) all of Cred's crypto positions were "hedged"; (c) Cred had generated a post-flash crash "a positive net income"; and (d) Cred provided "comprehensive insurance."

63.     On July 1, 2020, Victim #3 -- relying on the misleading reassurance he had received from SCHATT on March 12, 2020, believing that Cred's hedges were still in place, and believing that Cred was financially solvent -- invested $700,000 of the cryptocurrency Gemini (GUSD) in Cred.

64.     On July 31, 2020, Victim #2 -- relying on the language in his CredEarn Line of Credit Agreement that Cred would keep lenders apprised of all "material-contingent liabilities" and having not heard anything negative about Cred since his initial investment -- renewed his investment and then lent an additional 788.9 ETH (then worth approximately $272,604) to Cred.

65.     On August 6, Cred Employee #1 suggested to SCHATT and PODULKA that Cred's balance sheet should reflect that moKredit was not repaying its loans.  Despite the advice, the company's financial statements were never adjusted to reflect moKredit's failure to pay back the loan principal.

66.     Still, to the outside world, Cred was doing well.  And, during the all-hands meetings in July and August, SCHATT and PODULKA emphasized that the company was profitable and doing well, and pushed the sales team to bring in new business.  As a result, based on the sales teams projections of growth and stability, on August 11, 2020, Victim #4, transferred 50 bitcoin (then worth approximately $570,153) to Cred.  On August 12, 2020, Victim #4 transferred another 50 bitcoin (then worth approximately $579,246) to Cred.

67.     The turmoil inside Cred only worsened.  In late July, seeing the growing solvency crisis, PODULKA asked Cred Employee #1 to reach out to QuantCoin to withdraw some of Cred's assets.  QuantCoin responded that it would need until the first week of September to gather the assets.  Starting on August 21, 2020, however, Cred employees were unable to make contact with QuantCoin, receiving bounce back email messages over the weekend.  On August 24, 2020, PODULKA emailed Kingdom Trust asking for Scott Foster's new email address to inquire about Cred's account, Kingdom Trust responded that they had no such account and that Cred appeared to be the victim of a scam.  By August 24, 2020, in addition to the hole created by moKredit's failure to repay the principal on its $40 million in

loans, the company now knew that it had also lost 800 bitcoin (then worth about $9.4 million) belonging to its Cred customers in the QuantCoin scam.

68.    In mid-June, Cred approached Victim #5, a venture capital firm specializing in investment in early-stage companies involved in cryptocurrency, to solicit its interest in investing in the company.  Victim #5 evaluated Cred's financial viability, which included asking for financial information from PODULKA about the company assets and liabilities.  PODULKA provided financial information which indicated a positive valuation but did not include information about moKredit's outstanding loans, instead including the loans outstanding to moKredit as Cred assets.  Relying on the accuracy of the information it received from Cred, Victim #5 decided to invest and on  August 20, 2020, transferred $1,500,000 USD to Cred.

69.    Meanwhile, SCHATT and PODULKA did not inform Cred customers or Company #1 of the QuantCoin scam, and despite that loss and the "hole" created by moKredit's failure to repay the principal on its loans, they encouraged the sales team to step up its efforts to bring in new funds.  To that end, on August 24, 2020, Victim #6 – an existing Cred customer – responded to a Cred solicitation for "bonus rates" available only for a limited period of time by lending an additional 49.901 bitcoin (then worth approximately $571,858) to Cred.  Similarly relying on Cred's financial stability, on September 1, 2020, Victim #7 enrolled 5.32852044 bitcoin (then worth approximately $63,650) in CredEarn.

70.    Despite worsening financial conditions at Cred, SCHATT never wavered in his claim that the company was financially sound while pushing the sakes team to bring in new customer funds.  On August 31, 2020, SCHATT appeared in a Cred "Ask Me Anything" video question and answer session broadcast on YouTube where he extolled the company's financial health.  On September 11, SCHATT emailed his sales team, copying PODULKA, the following message:

**Subject**:     Up for the challenge!

Hi guys,

Given the number of redemptions we face this month, the next 21 days are absolutely pivotal to the level of success we will experience in 2020! We either must pull out a great deal of our high performing assets that are generating profits for the company to pay for redemptions, or we bring in more money than is going out!  This year, we've been unprofitable 4 months, and profitable 4 months.  Let's mark September as the month that we definitively stay profitable, overcome all of the challenges we've experienced, and KICK ASS!

The challenge → We bring in $5 million+ of NET NEW FUNDS over the next 21 days!  That means we bring in the same amount of money that is returned this month, PLUS $5M+!  And the challenge for October, we bring in PLUS $10M+!  This will require managing the redemptions, while putting pedal the metal on new customers and money!

71.     These gambits worked.  On October 1, 2020, in response to the promotional pushes received from the sales team and reassured about Cred's financial stability, Victim #8, transferred 600 ETH (then worth approximately $211,926) to Cred as part of the CredBorrow program.

72.     In early October, Victim #9, who had loaned Cred over $3.5 million USD, was approached about renewing Victim #9's commitment.  In response to Victim's #9's specific inquiries and request for current financial information, on October 11, 2020, PODULKA emailed Victim #9 at letter stating the following:

> Per your request, I confirm to the best of my knowledge and belief, and having made adequate and appropriate enquiries, the following four items.
>
> 1. The company generated a positive Net Income between April 1 and September 30.
> 2. The company has sufficient funds to cover operating expenses, paying debts as due.
> 3. The company has the resources to meet expected principal redemptions and interest payments through February 2021 – even if no additional funds are brought in.
> 4. The company's Current Ratio as of June 30 is between 80%-82%, in line or above the previous estimate.
>
> Sincerely,
>
> Joseph Podulka
> CFO

All four of the statements made in the October 11, 2020 letter were either false or misleading.

73.     On October 15, 2020, based on the false reassurances Victim #9 had received from PODULKA, Victim #9 re-enrolled Victim #9's loan to Cred in the total amount of $3,829,221.40.

INDICTMENT                14

74.     Also on October 15, 2020, relying on the misleading marketing materials regarding the CredEarn program still posted on Company #1's platform, Victim #7 enrolled 13,016.45 UPUSD cryptocurrency (then worth approximately $11,297) in CredEarn via a Company #1 account.

### The Last Days of Cred and Cred's Bankruptcy

75.     On October 23, 2020, representatives from Company #1 were asked by a news source whether it was aware that Cred had lost "a bunch of money." Company #1 contacted Cred, and during a two-hour recorded call, learned for the first time that (a) Cred had lost over $8 million during the QuantCoin deal, (b) Cred had no hedges, and (c) Cred's asset to liabilities ratio was off by tens of millions of dollars. On October 25, 2020, Company #1 ceased doing business with Cred and froze all Cred-related customer accounts on its platform. Company #1 also removed SCHATT from its Board of Directors.

76.     On November 7, 2020, Cred declared Chapter 11 bankruptcy. On November 9, 2020, SCHATT filed a declaration in support of Cred's Chapter 11 petition. In that declaration and in furtherance of the scheme to defraud, SCHATT misleadingly claimed that Cred's financial difficulties were primarily due to Alexander's "malfeasance," including his appropriation of approximately 225 bitcoin on June 24, 2020, and his alleged failure to conduct proper due diligence on QuantCoin.

COUNT ONE:  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)

77.     The factual allegations in Paragraphs 1 through 76 are re-alleged and incorporated as if fully set forth here.

78.     Beginning no later than March 12, 2020 and continuing until at least in or around November of 2020, in the Northern District of California, and elsewhere, the defendants,

DANIEL SCHATT, and
JOSEPH PODULKA,

knowingly conspired and agreed with each other, Alexander, and with others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNTS TWO THROUGH FOURTEEN:  18 U.S.C. § 1343 (Wire Fraud)

79.     The factual allegations in Paragraphs 1 through 76 are re-alleged and incorporated as if

fully set forth here.

80.    Beginning no later than March 12, 2020, and continuing through in or about November of 2020 in the Northern District of California, and elsewhere, the defendants,

DANIEL SCHATT, and
JOSEPH PODULKA,

did knowingly and with the intent to defraud devise and intend to devise a scheme and artifice to defraud customers of Cred as to a material matter, and to obtain moneys and property from customers of Cred by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, which scheme and artifice is summarized in paragraphs 1 through 76 above.

## The Use of the Wires

81.    On or about the dates set forth in the separate counts below, in the Northern District of California, and elsewhere, for the purpose of executing the scheme and artifice referred to above, and attempting to do so, the defendants

DANIEL SCHATT, and
JOSEPH PODULKA,

having knowingly, and with intent to defraud, devised and intended to devise a scheme and artifice to defraud Cred customers as to a material matter and to obtain money and property from Cred customers means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts, and, for the purpose of executing such scheme and artifice and attempting to do so, did transmit, and cause to be transmitted, by means of wire communication in interstate or foreign commerce, certain writings, signs, signals, pictures, and sounds, namely, the following:

| COUNT | DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| Two | April 14, 2020 | Email communication containing Victim #1's confirmation of re-enrollment of loan of 58.3 bitcoin |
| Three | April 23, 2020 | Transfer of 20 bitcoin from Victim #2's wallet ending in -wrDM to Cred's wallet ending in -29bR and transfer of 1710 ETH from Victim #2's wallet ending in -wrDM to Cred's wallet ending in -aCa7 |
| Four | July 1, 2020 | Transfer of 700,000 GUSD from Witness #3's Coin Generation account to Cred's wallet ending in -E694 |

INDICTMENT                              16

| Five | July 31, 2020 | Transfer of 788.9 ETH from Victim #2's wallet ending in Bad6 to Cred's wallet ending in -E694 |
| Six | August 11, 2020 | Transfer of 50 bitcoin from Victim #4's wallet ending in -SDfU to Cred's wallet ending in -zAtm |
| Seven | August 12, 2020 | Transfer of 50 bitcoin from Victim #4's wallet ending in -Qwit to Cred's wallet ending in -zAtm |
| Eight | August 20, 2020 | Transfer of $1,500,000 from Victim #5 to Cred Silvergate Bank account ending in -3143 |
| Nine | August 24, 2020 | Transfer of 49.901 bitcoin from Victim #6's wallet ending in -td37 to Cred wallet ending in -6kjh |
| Ten | September 1, 2020 | Victim #7 enrolled 5.32852044 BTC in CredEarn via his Uphold account |
| Eleven | October 1, 2020 | Victim #8 entered into a Line of Credit agreement with Cred pledging 600 ETH as collateral |
| Twelve | October 12, 2020 | Letter emailed from CFO PODULKA to Victim #9 |
| Thirteen | October 15, 2020 | Email communication containing Victim #9's confirmation of re-enrollment of loan of $3,829,221.40 USD |
| Fourteen | October 15, 2020 | Victim #7 enrolled 13,016.45 UPUSD in CredEarn via his account with Company #1 |

Each in violation of Title 18, United States Code, Section 1343 and 2.

COUNT FIFTEEN:  18 U.S.C. § 1956(a)(1)(A) (Engaging in a Financial Transaction to Promote Specified Unlawful Activity)

82.     The factual allegations in Paragraphs 1 through 81 are re-alleged and incorporated as if fully set forth here.

83.     As described below, on June 19, 2020 in the Northern District of California, the defendants

DANIEL SCHATT, and
JOSEPH PODULKA,

did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, that is, defendants authorized that 772.1915 bitcoin -- 500 bitcoin of which was derived from the proceeds of a specified unlawful activity, that is, wire fraud -- be transferred from Galois Capital's Coinbase account to Cred's Fireblocks wallet ending in -5mDB and then to Company # 2's wallet

ending in -JLVv as partial repayment of the Luxembourg bond, all with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

All in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i) and 2.

COUNT SIXTEEN:  18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity)

84.    The factual allegations in Paragraphs 1 through 81 are re-alleged and incorporated as if fully set forth here.

85.    As set forth in each Count below, in the Northern District of California, defendants

DANIEL SCHATT, and
JOSEPH PODULKA,

did knowingly engage and attempt to engage in monetary transactions, by, through and to financial institutions, in and affecting interstate commerce, in criminally derived property of a value greater than $10,000, and which in fact was derived from specified unlawful activity, namely, conspiracy to commit wire fraud as charged in Count One of this Indictment:

| COUNT | APPROXIMATE DATE | DESCRIPTION OF MONETARY TRANSACTION |
|-------|------------------|-------------------------------------|
| Sixteen | September 30, 2020 | Defendants transferred $250,000 in customer funds deposited in Cred's Silvergate account ending in -3143 to Cred Silvergate account ending in -3127 before transferring $100,000 from the Silvergate account ending in 3127 to Cred Customer #2 to pay a loan redemption. |

In violation of Title 18, United States Code, Section 1957.

FORFEITURE ALLEGATION:  18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)

86.    The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

87.    Upon conviction for any of the offenses set forth in Counts One through Fourteen of this Indictment, the defendants,

DANIEL SCHATT, and
JOSEPH PODULKA

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived from proceeds the defendant obtained directly and indirectly, as the result of those violations.

88.     Upon conviction for any of the offenses set forth in Counts Fifteen and Sixteen of this Indictment, the defendants,

DANIEL SCHATT, and<br>
JOSEPH PODULKA

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1) any property, real or personal, involved in such offense, or any property traceable to such property.

89.     If any of the property described above, as a result of any act or omission of the defendant:

    a.     cannot be located upon exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), 982(a)(1), Title 28, United States Code, Section 2461(c), and Federal Rule of Criminal Procedure 32.2.

DATED:                                           A TRUE BILL.


                                                 /s/ Foreperson
                                                 _____
                                                 FOREPERSON


ISMAIL J. RAMSEY
United States Attorney

_____
BARBARA J. VALLIERE
ADAM A. REEVES
Assistant United States Attorneys

INDICTMENT                          19

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT    ☐ INFORMATION    ☒ INDICTMENT

☐ SUPERSEDING

**OFFENSE CHARGED**

18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1956(a)(1)(A): Engaging in a Financial Transaction to Promote Unlawful Activity; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c): Forfeiture **+**

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:    please see attached sheet

Name of District Court, and/or Judge/Magistrate Location

**NORTHERN DISTRICT OF CALIFORNIA**

SAN FRANCISCO DIVISION

**DEFENDANT - U.S**

▶    United States v. Daniel Schatt

DISTRICT COURT NUMBER

CR24-00243 JD

**PROCEEDING**

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:    SHOW DOCKET NO.
   ☐ U.S. ATTORNEY    ☐ DEFENSE

☐ this prosecution relates to a pending case involving this same defendant    MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

Name and Office of Person Furnishing Information on this form    Ismail J. Ramsey

☒ U.S. Attorney    ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    Barbara J. Valliere

**DEFENDANT**

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction    ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No    If "Yes" give date filed

**DATE OF ARREST**    Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY**    Month/Day/Year

**FILED**
May 01 2024
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS    ☐ NO PROCESS*    ☒ WARRANT    Bail Amount:

If Summons, complete following:
☐ Arraignment    ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time:    Before Judge:

Comments:

<u>United States v. Daniel Schatt</u>

Penalties


Count One:  18 U.S.C. § 1349:  20 years' imprisonment,
                                         $250,000 fine
                                         3 years' supervised release
                                         $100 special assessment
                                         Restitution
                                         Forfeiture


Counts Two-Fourteen: 18 U.S.C. § 1343:
                                         20 years' imprisonment,
                                         $250,000 fine
                                         3 years' supervised release
                                         $100 special assessment
                                         Restitution
                                         Forfeiture


Count Fifteen:  18 U.S.C. § 1956(a)(1)(A):
                                         20 years' imprisonment,
                                         $500,000 fine
                                         3 years' supervised release
                                         $100 special assessment
                                         Restitution
                                         Forfeiture


Count Sixteen: 18 U.S.C. § 1957:
                                         10 years' imprisonment,
                                         $250,000 fine
                                         3 years' supervised release
                                         $100 special assessment
                                         Restitution
                                         Forfeiture

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT

☐ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1349: Conspiracy to Commit Wire Fraud; 18 U.S.C. § 1343: Wire Fraud; 18 U.S.C. § 1956(a)(1)(A): Engaging in a Financial Transaction to Promote Unlawful Activity; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity; 18 U.S.C. § 2: Aiding and Abetting; 18 U.S.C. § 981(a)(1)(C) & 28 U.S.C. § 2461(c): Forfeiture  ➕

PENALTY:    please see attached sheet

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

### DEFENDANT - U.S

▶ United States v. Joseph Podulka

DISTRICT COURT NUMBER

CR24-00243 JD

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. ATTORNEY   ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under }

Name and Office of Person Furnishing Information on this form    Ismail J. Ramsey

☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned)    Barbara J. Valliere

### DEFENDANT

**IS *NOT* IN CUSTODY**

1) ☒ Has not been arrested, pending outcome this proceeding.
   If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)
   _____

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges
   ☐ Federal   ☐ State
   If answer to (6) is "Yes", show name of institution
   _____

Has detainer been filed?   ☐ Yes   ☐ No
} If "Yes" give date filed _____

**DATE OF ARREST** ▶    Month/Day/Year _____

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶    Month/Day/Year _____

FILED

May 01 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT    Bail Amount: _____

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____    Before Judge: _____

Comments:

<u>United States v. Joseph Podulka</u>

Penalties

Count One:  18 U.S.C. § 1349:  20 years' imprisonment,
                                $250,000 fine
                                3 years' supervised release
                                $100 special assessment
                                Restitution
                                Forfeiture

Counts Two-Fourteen: 18 U.S.C. § 1343:
                                20 years' imprisonment,
                                $250,000 fine
                                3 years' supervised release
                                $100 special assessment
                                Restitution
                                Forfeiture

Count Fifteen:  18 U.S.C. § 1956(a)(1)(A):
                                20 years' imprisonment,
                                $500,000 fine
                                3 years' supervised release
                                $100 special assessment
                                Restitution
                                Forfeiture

Count Sixteen: 18 U.S.C. § 1957:
                                10 years' imprisonment,
                                $250,000 fine
                                3 years' supervised release
                                $100 special assessment
                                Restitution
                                Forfeiture