1
2
3
4
5
6
7
8            UNITED STATES DISTRICT COURT
9
10             NORTHERN DISTRICT OF CALIFORNIA
11
12

United States District Court
Northern District of California

13   UNITED STATES OF AMERICA,                No.  CR 24-00243 WHA
14              Plaintiff,
15        v.                                  **ORDER DENYING DEFENDANTS'
                                              MOTION TO DISMISS
16   DANIEL SCHATT AND JOSEPH                 INDICTMENT IN PART AND TO
     PODULKA,                                 STRIKE OMISSIONS THEORY AS
17                                            INSUFFICIENTLY PLEADED OR, IN
              Defendants.                     THE ALTERNATIVE, FOR A BILL
18                                            OF PARTICULARS**
19
20
21                            **INTRODUCTION**
22        In this wire-fraud prosecution of former executives of a now-bankrupt cryptocurrency
23   enterprise, defendants move to dismiss part of the indictment against them for failure to state
24   an omissions-based theory of wire fraud.  They move, in the alternative, for a bill of particulars
25   concerning the same.  For the reasons stated below, defendants' motion is **DENIED**.
26
27
28

**STATEMENT**

Defendants Daniel Schatt and Joseph Podulka have been charged by indictment with conspiracy to commit wire fraud (Count One), wire fraud (Counts Two through Fourteen), engaging in a financial transaction to promote specified unlawful activity (Count Fifteen), and engaging in monetary transactions in property derived from specified unlawful activity (Count Sixteen) (Dkt. No. 1 at 15-18).

The indictment alleges, among other things, the following:

Cred LLC ("Cred") was a San Francisco-based financial services platform serving both retail and institutional clients. Defendant Schatt was co-owner and CEO of Cred, while Defendant Podulka was CFO (*id*. at ¶¶ 1, 6-7).

Two Cred products are relevant here: CredBorrow, which offered borrowers USD loans collateralized by the borrower's cryptocurrency, and CredEarn, which allowed lenders to deposit cryptocurrency at a yield of up to 12%, to be paid in cryptocurrency (*id*. at ¶ 39). Both borrowers (CredBorrow) and lenders (CredEarn) are sometimes referred to as "customers" throughout the indictment and this order.

Cred represented that funds deposited via CredEarn were lent to other customers on a "fully collateralized or guaranteed" basis (*ibid*.). Some CredEarn Line of Credit Agreements represented:

> All financial and other information that has been or will be supplied to the Lender [*i.e.*, customer] is sufficiently complete to give the Lender accurate knowledge of the Borrower's [*i.e.*, Cred] financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower.

(*id*. at ¶ 42).

Cred's press release announcing the CredEarn product, meanwhile, claimed that Cred was "a licensed lender with comprehensive insurance" (*id*. at ¶ 43). An article published by Defendant Schatt the next day represented: "Going Above and Beyond: Cred leads with most comprehensive risk management and insurance of any crypto-lending platform." Also: "If the

2

worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole" (*ibid.*).  An altered version of that same article was published a second time, months later, making the same representations (*ibid.*).

Cred's marketing and sales efforts were built around three key points:  (1) Cred lends customer assets on a "fully collateralized and guaranteed basis," and "any borrower must collateralize their loan," (2) Cred's "crypto positions are hedged," and (3) Cred has "comprehensive insurance," and "[i]f the worst happens and Cred loses customer funds, customers deserve certainty that they will be made whole" (*id.* at ¶ 44).

What customers didn't know was that Cred largely relied on one entity, a Chinese company called "moKredit" created by another of Cred's founders, "to generate virtually all of the interest payments that provided [CredEarn's] yield," and that moKredit itself "generated the money Cred used to pay interest to its customers by making unsecured micro-loans to Chinese gamers" (*id.* at ¶ 30).

COVID emerged as a national emergency in March 2020, resulting in a "flash crash" in the cryptocurrency markets.  Cred's bottom line was devastated, it was unable to meet its margin calls, and its hedges got "blown out" (*id.* at ¶ 49).  Just before, Cred itself was taken in: a purported "asset manager" convinced them to part with over seven million dollars in cryptocurrency before vanishing a few months later (*id.* at ¶¶ 47, 67).  Even as Cred tried and failed to recall ten million dollars of principal from its $40 million loan to moKredit, Defendant Schatt represented to customers, via email, that Cred was "prepared for extreme situations like the coronavirus (COVID-19) outbreak," and that "[w]e are convinced now more than ever that Cred's 'All Weather' approach to risk management and deep understanding of capital markets will be of great help to our partners and customers" (*id.* at ¶ 52).  That same day, the company solely responsible for Cred's hedging strategy informed Cred that its futures positions were liquidated and requested three million dollars in additional collateral (*id.* at ¶ 53).

On March 16, four days after Defendant Schatt's public assurances, Cred's general counsel informed defendants that the company may not be "financial[ly] solvent," and

3

cautioned that "Cred must be careful at all times to be accurate in its statements to its creditors and to all stakeholders," so as "not to mislead our customers and creditors" (*id.* at ¶ 54).

On March 18, just two days after his own general counsel's caution, Defendant Schatt directed a salesperson to assure a victim that the crash "was a good thing for our company," because "our capital market team was able to protect all of our positions and even captured a significant premium through this event — all assets are safe and we will not have any problem delivering principle (*sic*) on interest" (*id.* at ¶ 55). That alleged victim went on to renew his CredEarn deposit, worth nearly half a million dollars, shortly thereafter (*ibid.*).

In April 2020, meanwhile, a Cred employee informed defendants — through an internal liquidity analysis titled "Post March 2020 Flash Crash" — that Cred "was operating at a loss and was completely exposed to losing money as the price of Bitcoin rose because it no longer had hedges in place" (*id.* at ¶ 56).

Cred attempted to shore itself up by securing existing deposits and attracting new customers and investors (*id.* at ¶ 70). Defendant Schatt himself participated in a promotional push that tried to, and did, pull in cash intended to cover growing redemptions (*ibid.*). Defendant Podulka, meanwhile, sent a victim the below letter — quoted in the indictment — in a (successful) attempt to secure the re-enrollment of a nearly four-million-dollar loan:

> Per your request, I confirm to the best of my knowledge and belief, and having made adequate and appropriate enquiries, the following four items.
>
> 1. The company generated a positive Net Income between April 1 and September 30.
> 2. The company has sufficient funds to cover operating expenses, paying debts as due.
> 3. The company has the resources to meet expected principal redemptions and interest payments through February 2021 – even if no additional funds are brought in.
> 4. The company's Current Ratio as of June 30 is between 80%-82%, in line or above the previous estimate.
>
> Sincerely,
>
> *Joseph Podulka*
>
> Joseph Podulka
> CFO

1    (*id.* at ¶ 72).  The indictment alleges that "[a]ll four of the statements made in the . . . letter

2    were either false or misleading" (*ibid.*).

3        The wheels fell off shortly thereafter, and Cred declared bankruptcy in November of

4    2020 (*id.* at ¶ 76).

## ANALYSIS

6        Defendants argue that the indictment should be dismissed to the extent that it relies on a

7    fraud-by-omission theory because it fails to disclose any basis for defendants' duty to disclose.

8    Barring dismissal, they seek a bill of particulars detailing the factual basis for defendants'

9    duty to disclose.  This order follows full briefing and oral argument.

10        1.    MOTION TO DISMISS.

11        An indictment "must be a plain, concise, and definite written statement of the essential

12    facts constituting the offense charged," which "first, contains the elements of the offense

13    charged and fairly informs a defendant of the charge against which he must defend, and,

14    second, enables him to plead an acquittal or conviction in bar of future prosecutions for the

15    same offense."  *Hamling v. United States*, 418 U.S. 87, 117 (1974) (citations, internal

16    quotation marks omitted); Fed. R. Crim. P. 7(c)(1).  "The Government need not allege its

17    theory of the case or supporting evidence, but only the essential facts necessary to apprise a

18    defendant of the crime charged."  *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982).

19        "To convict a defendant of wire fraud, the jury must find beyond a reasonable doubt:  (1)

20    the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the

21    scheme; and (3) a specific intent to defraud."  *United States v. Lindsey*, 850 F.3d 1009, 1013

22    (9th Cir. 2017).  The false or fraudulent pretenses, representations, or promises underpinning

23    such a scheme may take the form of affirmative misrepresentations, half-truths, or omissions of

24    material information.  *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015).

25        Defendants concede that the indictment sufficiently alleges both fraud-by-

26    misrepresentation and fraud-by-half-truths.  They challenge only the indictment's fraud-by-

27    omissions theory.  Unlike fraud-by-misrepresentation and fraud-by-half-truths, a duty to

28    disclose is a necessary, albeit implied, element of fraud-by-omission.  That duty may arise

United States District Court
Northern District of California

5

United States District Court
Northern District of California

1   from statute, a formal fiduciary relationship, or an informal, trusting relationship.  The parties

2   agree that neither a statutory duty nor formal fiduciary relationship existed between defendants

3   and their alleged victims, but dispute the existence of informal, trusting relationships.

4       Defendants assert that they did not, as a matter of law,  have informal, trusting

5   relationships with their alleged victims, and that the government's fraud-by-omissions theory

6   must therefore be dismissed for failure to allege a duty to disclose.  The government agrees

7   that a duty to disclose is a necessary, implied element of their fraud-by-omissions theory, and

8   must therefore be alleged in the indictment, but argues, *first*, that the law in our circuit requires

9   only a "bare bones" recitation of the necessary elements of the charge, which the indictment

10  does, and *second*, that the indictment goes further than necessary and alleges the factual basis

11  for that duty, namely, defendants informal, trusting relationships with their alleged victims.

12      *First*, the indictment adequately alleges a duty to disclose.  In our circuit, "[a]n

13  indictment that tracks the words of the statute violated is generally sufficient, but implied,

14  necessary elements, not present in the statutory language, must be included in an indictment."

15  *United States v. Jackson*, 72 F.3d 1370, 1380 (9th Cir. 1995).  "[B]are bones" indictments that

16  do little more than set forth "all essential elements of the crime to be punished" are "quite

17  common and entirely permissible."  *United States v. Crow*, 824 F.2d 761, 762 (9th Cir. 1987);

18  *see United States v. Woodruff*, 50 F.3d 673 (9th Cir. 1995) (indictment charging Hobbs Act

19  violation relating to attempted robbery "was sufficient as written" despite containing "*no facts*

20  alleging how interstate commerce was interfered with," or "*any* theory of interstate impact")

21  (emphasis added).  Here, the indictment alleges, in relevant part, that defendants "engaged in a

22  scheme, plan, and artifice to defraud" "by making materially false and misleading statements,

23  and failing to disclose material facts *with a duty to disclose*" (Dkt. No. 1 at ¶ 26) (emphasis

24  added).  Defendants do not cite, and the judge has not found, any binding authority requiring

25  the indictment to go any further, such as by setting out the factual basis for that duty.  That,

26  alone, is fatal to defendants' motion.

27      *Second*, the facts alleged in the nineteen-page indictment — some recited above —

28  sufficiently set forth a factual basis for defendants' duty to disclose.  "[T]he relationship

6

1    creating a duty to disclose may be a formal fiduciary relationship, or an *informal, trusting*

2    *relationship*." *United States v. Shields*, 844 F.3d 819, 823 (9th Cir. 2016) (emphasis added).

3    The latter requires that the accused "[1] act[ed] for the benefit of another and [2] induce[d] the

4    trusting party to relax the care and vigilance which it would ordinarily exercise." *Ibid*.

5         The nineteen-page indictment alleges that defendants, acting for the benefit of their

6    victims, induced the latter to relax the care and vigilance they would ordinarily exercise.  Cred

7    offered two relevant products:  *first*, CredEarn, which allowed lenders (referred to as

8    "customers" by the indictment) to deposit their cryptocurrency with Cred and earn a yield of

9    up to twelve percent, and *second*, CredBorrow, which offered loans in dollars to customers,

10   collateralized via customers' cryptocurrency.  The indictment alleges that Cred promised

11   significant benefits with little to no risk.  Press releases described Cred as "a licensed lender

12   with comprehensive insurance," while an article authored by Defendant Schatt claimed that

13   "Cred leads with most comprehensive risk management and insurance of any crypto-lending

14   platform" (Dkt. No. 1 at ¶ 43).  Defendant Schatt's article, which displayed the logo of a

15   national insurance company, claimed that "[i]f the worst happens and Cred loses customer

16   funds, customers deserve certainty that they will be made whole" (*ibid.*).  Cred's marketing

17   materials further claimed that all assets were lent on a "fully collateralized and guaranteed

18   basis," and that all of Cred's "crypto positions are hedged" (*id*. at ¶ 44).  Some versions of the

19   CredEarn Line of Credit Agreement, meanwhile, included the following provision:

20              All financial and other information that has been or will be
             supplied to the Lender is sufficiently complete to give the Lender
21           accurate knowledge of the Borrower's financial condition,
             including all material contingent liabilities.  Since the date of the
22           most recent financial statement provided to the Lender, there has
             been no material adverse change in the business condition
23           (financial or otherwise), operations, properties or prospects of the
             Borrower.
24

25   (*id*. at ¶ 42)

26         The indictment further alleges that in an attempt to right the ship following the March

27   2020 "flash crash," defendants tried to secure existing deposits and draw in new customers and

28   investors, despite Cred's faltering finances.  Defendant Schatt appeared in a video broadcast

United States District Court
Northern District of California

7

1    extolling the company's financial health, while Defendant Podulka attempted to allay a

2    victim's misgivings through a signed letter containing allegedly false or misleading statements

3    concerning Cred's financial situation (*id*. at ¶¶ 71, 72).

4        Having established a trusting relationship, the government's argument goes, defendants

5    shirked the concomitant duty to disclose:  Following the March 2020 "flash crash,"

6    defendants' hedging partner liquidated all of Cred's trading positions and ceased all business

7    with Cred (*id*. at ¶¶ 53, 55), moKredit — to whom Cred had lent about $40 million dollars —

8    informed Cred that it could not honor its promise to repay the principal on that loan (*id*. at ¶¶

9    56, 60, 68), and Cred's insurers denied its claims, leaving victims' deposits uninsured (*id*. at ¶

10   58).  Over seven million dollars of bitcoin handed over to supposed asset managers,

11   meanwhile, vanished in a scam (*id*. at ¶¶ 67, 69).  Defendants failed to disclose each of the

12   above facts to victims during their post-crash push to shore up Cred's finances.

13       The indictment, only partially summarized in this order, does *more* than enough to

14   apprise defendants of the charges against them and any possible defenses at trial.  *Hamling*,

15   418 U.S. at 117.

16       Defendants hone in on Section 4.4 of the CredEarn Line of Credit Agreement, quoted

17   above, and argue that "*this singular factual allegation* is insufficient to support the

18   government's fraud-by-omissions theory" for three reasons:  *First*, "a contractual promise

19   cannot create a duty to disclose for purposes of a fraud prosecution," *second*, if such a

20   contractual duty can exist, the indictment fails to impute that duty onto defendants (as opposed

21   to Cred, the company), and *third*, even if Section 4.4 created a duty to disclose, those counts

22   not premised on the CredEarn Agreement must still be dismissed (Dkt. No. 77 at 6-9).

23       Defendants' arguments fail for three reasons.

24       *First*, defendants' insistence that a breach of contract cannot serve as a fraud is incorrect.

25   For example, if a fraudster scams the public by selling tour packages to Hawaii, then skips out

26   with the money, there is a breach of a contract, yes, but there is also a fraudulent scheme in

27   which the promise was corrupt from the start.  Even when a contract begins as legitimate, the

28   once-legitimate business party can turn to a fraudulent scheme to cheat his customers.  Yes, he

United States District Court
Northern District of California

8

1   will violate contract provisions along the way, but all in aid of a scheme to defraud, and with

2   the specific intent to defraud.  Every breach of contract that is in aid of a fraudulent scheme is

3   part of that fraudulent scheme.

4          Defendants' fear that this will "make a criminal out of every salesman" is misplaced

5   (Dkt. No. 77 at 7).  Our court of appeals, presented with that very concern in the honest

6   services context, explained that the specific intent element of the mail fraud statute serves "to

7   limit the conduct susceptible to prosecution under the otherwise broad reach of the Mail Fraud

8   Statute."  *Milovanovic*, 678 F.3d 713.  The same is true as to wire fraud.  The specific intent

9   requirement of the wire fraud statute ensures that liability will not attach to the innocuous

10  contract breach while allowing for the prosecution of the fraudster, contract or no.  *United*

11  *States v. Lothian*, 976 F.2d 1257, 1267 (9th Cir. 1992) ("To sustain a conviction under the mail

12  and wire fraud statutes, there must be sufficient evidence to show that the defendant willfully

13  participated in a scheme with knowledge of its fraudulent nature and with intent that these

14  illicit objectives be achieved.") (cleaned up).  Defendants' contrary rule — that the inclusion of

15  a representation or promise in a private contract places it beyond the reach of the government

16  — would grant fraudsters new-found safe harbor, so long as they communicated their

17  fraudulent pretenses, representations, and promises through contract.

18         *Second*, defendants' premise — that Section 4.4 of the CredEarn Agreement, standing

19  alone, did not create a duty to disclose — misses the forest for the trees.  The indictment

20  "should be read in its entirety, construed according to common sense, and interpreted to

21  include facts which are necessarily implied."  *United States v. Givens*, 767 F.2d 574, 584 (9th

22  Cir. 1985).  The indictment alleges myriad facts, summarized above, that may support the

23  government's theory of an informal, trusting relationship, including representations made by

24  defendants personally, through video, email, blogs, and articles, and representations made by

25  Cred employees working at the direction of defendants, or so a reasonable jury could find.

26  These include general marketing materials, statements targeting existing customers, and in at

27  least one instance, a signed letter from Defendant Podulka to a hesitant victim (reproduced

28  above), which the indictment alleges contained several misrepresentations intended to quell

United States District Court
Northern District of California

United States District Court
Northern District of California

1    that victim's misgivings and secure the re-enrollment of a nearly four-million-dollar loan.  The

2    indictment's fraud-by-omissions theory, in sum, does not hinge on breach of contract.

3        Defendants' out-of-circuit and otherwise non-binding decisions are inapposite for that

4    reason.  In *United States v. Keuylian*, the three-page indictment alleged "no misrepresentation,

5    no false pretense, no false promise, and no concealment" beyond "conclusory allegations" that

6    the defendant "executed a scheme to defraud . . . by means of" such statements, instead relying

7    solely on an alleged failure to abide by the terms of a contractual relationship.  23 F. Supp. 3d

8    1126, 1128 (C.D. Cal. 2014).  In *United States v. Steffen*, meanwhile "*the Government [did]*

9    *not argue that Steffen was bound by a fiduciary or statutory duty to disclose*.  Rather, the

10   alleged omissions [were] indistinguishable from breaches of Steffen's contractual duties under

11   the security agreement. Accordingly, the indictment fail[ed] to allege a scheme to defraud

12   based on this theory."  687 F.3d 1104, 1116 (8th Cir. 2012).

13       *Finally*, defendants' argument that "the indictment fails to impute [the duty to disclose]

14   onto defendants (as opposed to Cred, the company)" fails, *first* because if Cred devised a

15   scheme to defraud its customers and investors through the omission of material information

16   contrary to a duty to disclose, defendants' participation in that scheme would be enough to

17   render them liable for fraud-by-omissions.  They need not have owed the victims of such a

18   scheme a free-standing, individual duty to disclose, so long as the company had such a duty.

19   *Second*, the instant indictment *does* allege facts sufficient to support an individual duty to

20   disclose on the part of both defendants.

21                   *        *        *

22       At oral argument, meanwhile, defense counsel argued that there could be no informal,

23   trusting relationship because the indictment did not allege facts tending to show that

24   defendants "act[ed] for the benefit of" their alleged victims.

25       All business relationships involve some degree of trust, confidence, and exchange of

26   benefits, defendants argue, but each party nevertheless continues to act on their own behalf,

27   and for their own benefit.  Any benefit to a counterparty is secondary or incidental to such

28   "arms-length" business dealings.  They argue that an informal, trusting relationship,

meanwhile, encompasses *only* those relationships akin to "canonical examples of fiduciary-like relationships — attorney-client, trustee-beneficiary, doctor-patient, guardian-ward, principal-agent," wherein "the person that owes the duty must act . . . for the benefit of their counterparty," meaning that he "must subordinate his interest to those of the counterparty" (Dkt. No. 80). They did not "act for the benefit of" the victims of the alleged scheme, defendants assert, because no such subordination of self-interest took place.

*First*, "[t]he existence of a fiduciary duty in a criminal prosecution is a fact-based determination that must ultimately be determined by a jury properly instructed on this issue." *United States v. Milovanovic*, 678 F.3d 713, 723 (9th Cir. 2012), *as amended* (May 22, 2012). While defendants' arguments concerning the dividing line between "arms-length" and "trusting" relationships may well have merit, they are for the jury to decide. "[T]he issue in judging the sufficiency of the indictment is whether the indictment adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the Government can prove its case." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982). The indictment has more than met that burden.

*Second*, defendants' proposed reading of "for the benefit of" improperly narrows the range of informal, trusting relationships recognized by *Shields* and *Milovanovic*. The term fiduciary is a "broad one," and encompasses "informal, trusting relationship[s] in which one party *acts for the benefit of another* and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." *Shields*, 844 F.3d at 819. "This definition is broad, but intentionally so." *Milovanovic*, 678 F.3d at 723. Neither decision requires that an individual *subordinate* their interests to that of a counterparty — only that they "act[] for the benefit of another," which they may well do while still pursuing their *own* interests. Nor does either decision rely on or analogize to counsel's proffered "canonical examples of *fiduciary-like* relationships" that *do* require one to "put the interest of the counterparty first" (Dkt. No. 80). Most of those examples — attorney-client, trustee-beneficiary, guardian-ward, principal-agent — are long-recognized fiduciary relationships unrelated to the facts and holdings of *Milovanovic* and *Shields*. *Parrish v. Nat'l Football League Players Ass'n*, 534 F. Supp. 2d

1    1081, 1097 (N.D. Cal. 2007) ("A fiduciary relationship is a recognized legal relationship such

2    as a guardian and ward, trustee and beneficiary, agent and principal, or attorney and client.")

3    (quoting *Richelle L. v. Roman Catholic Archbishop,* 106 Cal.App.4th 257, 271, 130

4    Cal.Rptr.2d 601 (2003));  *Tethys Bioscience, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky &*

5    *Popeo, P.C.*, No. C 09-5115 CW, 2009 WL 4722679, at *3 (N.D. Cal. Dec. 9, 2009) (Judge

6    Claudia Wilken) ("The relation between attorney and client is a fiduciary relation of the very

7    highest character.") (internal quotation marks, citations omitted); *Russell v. Maman*, No. 18-

8    CV-06691-RS, 2019 WL 13039744, at *5 (N.D. Cal. June 19, 2019) (Judge Richard Seeborg)

9    ("Traditional examples of fiduciary relationships imposed by law include trustee and

10   beneficiary. . . .").

11        Defense counsel conceded at oral argument that *no* binding decision has thrown out an

12   indictment on the basis of the distinction they now advance.  The one in-circuit order counsel

13   did cite, from this district, is inapposite.  *United States v. Lonich*, No. 14-CR-00139-SI-1, 2016

14   WL 324039 (N.D. Cal. Jan. 27, 2016) (Judge Susan Illston).  There, like here, the defendants

15   moved to dismiss the indictment's omissions theory of fraud for failure to allege a duty to

16   disclose.  The *Lonich* indictment, however, failed to make even a bare bones allegation of a

17   such a duty.  There, the government argued, incorrectly, that "the issue of duty is not an

18   element of the offense that must be alleged, but rather that the duty exception is an affirmative

19   defense *and thus need not be alleged in the Indictment*."  *Lonich*, 2016 WL 324039 at *7

20   (cleaned up; emphasis added).  *Lonich* held only that the indictment must allege such a duty.

21   The *Lonich* defendants' motion did not advance defense counsel's narrow reading of "for the

22   benefit of," and Judge Illston's order did not endorse such a reading.

23        Defendants' reading, moreover, runs headlong into both *Shields* and *Milovanovic*.

24        The *Shields* defendants — founders of a failed real estate development firm who claimed

25   to be "three veteran entrepreneurs, each with a track record of success in his chosen field" —

26   obtained and then squandered millions in investor funds.  *Shields*, 844 F.3d at 821.  At trial, the

27   government advanced both fraud-by-misrepresentation and fraud-by-omission.  A jury

28   convicted two of the defendants of wire fraud, among other things; the third entered a guilty

plea.  On appeal, the convicted defendants argued that the trial court erred in not instructing the

jury that the government's fraud-by-omissions theory required a finding that a duty to disclose

existed.  Our court of appeals, reviewing for plain error, agreed with defendants, but declined

to reverse because the jury "would most likely have concluded that [informal, trusting]

relationships existed among the defendants and investors[:]"

> If a jury concluded that this omission [defendants' prior
> bankruptcies] was material . . . the jury would have likely
> concluded that defendants presented their financial histories to
> investors in a positive light *to convince investors to trust
> defendants with their money, making a trusting relationship likely*.

*Id*. at 824 (emphasis added).  *Shields* did not cite any facts suggesting that defendants "act[ed]

for the benefit of" their investors beyond the general nature of the investor/investee

relationship.

In *Milovanovic*, meanwhile, the defendant, "a bilingual English and Bosnian speaker, was

an independent contractor for Spokane International Translation, which itself contracted to

provide translation services to government agencies."  *Milovanovic*, 678 F.3d at 718.  As part

of the scheme to defraud, the defendant helped Bosnian-speaking individuals obtain

commercial drivers' licenses by sitting in on the written exam as a "translator" and feeding

them answers for a $2,500 fee.  A co-conspirator then falsified the results of the skills test for

each applicant.  The trial court in *Milovanovic* dismissed the superseding indictment, holding

that liability for honest services fraud could not attach absent an employment or agency

relationship.  Our court of appeals reversed, holding:

> We are satisfied that the superseding indictment sufficiently
> alleges a breach of a position of trust both to honestly and fairly
> administer tests and to truthfully certify to the State applicants
> residing in Washington who are qualified to be commercial vehicle
> operators. *We do not decide whether Milovanovic—a third-party
> tester whose contract was with a translation services company, not
> the State . . . did, in fact, owe a fiduciary duty to the State of
> Washington. That is for the jury to decide, as properly instructed
> on the elements which constitute reposing a special trust that
> requires honest administration of tests and truthful reports of their
> results.*

1    *Id*. at 724 (emphasis added).  *Milovanovic* cited no facts suggesting that the defendant, a

2    subcontractor, subordinated his own interests to those of the State of Washington, with whom

3    he did not so much as have a contract.

4         In sum, defendants' proffered reading of *Shields* and *Milovanovic* cuts against the results

5    reached by those decisions:  Neither endorsed the strict view of the first prong of the test

6    advanced by defendants.  This order hews to our court of appeals' "broad" understanding of

7    informal, trusting relationships, and leaves the issue to "be determined by a jury properly

8    instructed on this issue."  *Ibid*.  A charging conference will follow the close of the evidence at

9    trial, at which time the instructions of law regarding the duty to disclose, as the case is actually

10   tried, will be settled.

11        **2.    BILL OF PARTICULARS.**

12        Defendants argue, alternatively, that the government should be ordered to "identify the

13   precise nature of any duty (or duties) to disclose" through a bill of particulars (Dkt. No. 77 at

14   8).  They seek, *as to each alleged omission*, "(a) the individual who allegedly omitted the

15   information; (b) precisely what is alleged to have been omitted; (c) when that omission is

16   alleged to have occurred; (d) the nature of the alleged duty to disclose and any factual basis for

17   it; (e) the individual or entity to whom that duty allegedly was owed and to whom the omission

18   is alleged to have been directed; and (f) the factual basis establishing why the alleged omission

19   is deemed to be fraudulent" (*id*. at 10).

20        Rule 7(f) provides that "[t]he court may direct the government to file a bill of

21   particulars."  Fed. R. Crim. P. 7(c)(1).  Our court of appeals has explained:

22            A motion for a bill of particulars is appropriate where a defendant
             requires clarification in order to prepare a defense.  It is designed
23            to apprise the defendant of the specific charges being presented to
             minimize danger of surprise at trial, to aid in preparation and to
24            protect against double jeopardy.
             [. . .]
25            In determining if a bill of particulars should be ordered in a
             specific case, a court should consider whether the defendant has
26            been advised adequately of the charges through the indictment and
             all other disclosures made by the government.  Full discovery will
27            obviate the need for a bill of particulars.

28   *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citations omitted).

United States District Court
Northern District of California

14

Defendants are "not entitled to know all the evidence the government intends to produce, but only the theory of the government's case." *Yeargain v. United States*, 314 F.2d 881, 882 (9th Cir. 1963).  For example, "there is no requirement in conspiracy cases that the government disclose even all the overt acts in furtherance of the conspiracy." *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) ("While the particulars of the scheme . . . must be described with a degree of certainty sufficient to . . . acquaint the defendant wi[th] the particular fraudulent scheme charged against him, *still the scheme itself need not be pleaded with all the certainty in respect of time, place, and circumstance*. . .") (emphasis added).  "The denial of a motion for a bill of particulars is within the discretion of the district court; its decision will not be disturbed absent an abuse of this discretion." *Giese*, 597 F.2d at 1180.

The nineteen-page indictment is sufficiently particularized.  The indictment need only provide enough detail to fairly apprise defendants of the charges and enable the preparation of a defense.  It has done so.  Defendants' motion, meanwhile, asks this order to impose a bone-crushing straitjacket on the government.  It is **DENIED**.

CONCLUSION

For the foregoing reasons, defendants' motion is **DENIED**.

**IT IS SO ORDERED.**

Dated:  January 6, 2025.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE